1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JULIAN ELIZABETH ST MARIE,

                Plaintiff,

     v.

JEFFERSON COUNTY et al,

                Defendant.

CASE NO. 3:22-cv-05893-DGE

ORDER ON MOTION FOR
SUMMARY JUDGMENT (DKT.
NO. 60)

## I.      INTRODUCTION

      This matter comes before the Court on Defendants' motion for summary judgment to dismiss all remaining claims in this action.  (Dkt. No. 60.)  Having considered Plaintiff Julian St. Marie's response (Dkt No. 68), Defendants' reply (Dkt. No. 71), and the remaining record, the Court GRANTS summary judgment dismissal of all of Plaintiff's claims.

## II.    BACKGROUND

### A. Plaintiff's Work History

Plaintiff Julian St. Marie was hired by the Jefferson County Prosecuting Attorney's Office ("JCPAO") as Chief Deputy Prosecuting Attorney in 2015.  (Dkt. No. 69 at 4.)  In 2018, Defendant James Kennedy was elected as the Jefferson County Prosecuting Attorney.  (Dkt. No. 60 at 4.)  Kennedy assumed office in January 2019.  (Dkt. No. 61 at 2.)  On February 4, 2019, Kennedy abolished the Chief Deputy Prosecuting Attorney position and replaced it with the position of Chief Criminal Deputy Prosecuting Attorney.  (Dkt. No. 61-1 at 2.)  He reclassified Plaintiff as a "Deputy Prosecuting Attorney" and approved her for a pay raise effective February 1, 2019.  (*Id*. at 4.)  Around this time, Kennedy appointed Defendant Christopher Ashcraft, who had previously served as Chief Criminal Deputy Prosecutor for the JCPAO, as Chief Criminal Deputy Prosecuting Attorney.  (Dkt. No. 60 at 4); (Dkt. No. 62-1 at 68).  In March 2021, Plaintiff began covering district court dockets for a colleague on maternity leave.  (Dkt. No. 69 at 6.)

On May 13, 2021, Kennedy sent Plaintiff an email with the subject line "Re: Tentative Decision to Terminate Your Employment."  (Dkt. No. 61-1 at 39.)  In the email, Kennedy explained:

> Events over the past month and a half rapidly devolved to a point where you no longer have a functional relationship with multiple members of this office, including me.  This is a result of your behavior, including haranguing your supervisors and support staff in common areas of the office, and your failure to make sure that witnesses are subpoenaed in cases assigned to you.  Your behavior towards staff, which I characterize as abusive, is intolerable.  Several staff members have told management that [they] are uncomfortable being in your presence.  The final straw was allowing the *State v. Patrick Hundtoft* case to get dismissed on May 5, 2021[,] because no witnesses had been subpoenaed, even after Chris identified at least one witness you should subpoena.

1    (*Id*.)  The record provides an account of the events Kennedy describes, which took place in April

2    and May of 2021.

3          In early May 2021, Plaintiff delayed issuing trial subpoenas for the *State v. Patrick*

4    *Hundtoft* matter such that, by the time they were issued, certain preferred witnesses were

5    unavailable for a criminal trial in state court.  (Dkt. No. 61-1 at 19.)  On May 5, 2021—the day

6    before the *State v. Patrick Hundtoft* trial was set to begin—Plaintiff asked for a

7    continuance.  (Dkt. No. 62-1 at 99.)  Plaintiff informed the court that, although she could proceed

8    with the remaining witnesses, she had a mandatory meeting and was therefore unavailable for

9    trial.  (*Id*.)  The state court denied Plaintiff's request and dismissed the case.  (*Id.* at 101.)  The

10   judge noted that "[t]his has been an ongoing issue . . . You had multiple opportunities to declare

11   ready or not ready . . . . I don't even have a subpoena in my file."  (*Id*.)  In a subsequent email

12   exchange, Kennedy described Plaintiff's "failing to contact her witnesses or get subpoenas out"

13   as "a major screw up in of itself." (Dkt. No. 61-1 at 33.)  Plaintiff later attributed the late

14   subpoenas to practices around the Laserfiche system that she found "unworkable" and her

15   impression that she "was not getting the legal assistance [she] needed."  (Dkt. No. 68-1 at 33.)

16         Prior to the May 5th trial incident, Kennedy was already in communication with JCPAO

17   staff members about Plaintiff's performance issues.  On May 4, 2021, Kennedy confirmed to

18   Ashcroft that he had forwarded "concerns about [Plaintiff's] abusive behavior" to Human

19   Resources.  (Dkt. No. 61-1 at 14.)  Kennedy also reached out to a Human Resources staffer,

20   Defendant Andy Rowlson, on April 29, 2021, after a difficult meeting with Plaintiff about her

21   performance.[1]  (*Id.* at 10.)  The record shows Kennedy and Ashcroft were engaged in discussions

22

23   ――――――――――――――――
     [1] The events of April 29, 2021, are disputed.  In a document entitled "Memorandum on Today's
24   Events with Julie St. Marie," Kennedy describes Plaintiff becoming incredibly upset—screaming

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 60) - 3

about Plaintiff's alleged mishandling of the district court docket since at least April 12, 2021. (*Id.* at 17) ("Julie needs someone with her—the fact that she is not ready for this week's trial is stunning.").

On May 7, 2021, Plaintiff met with Rowlson. The two discussed various problems, including that Plaintiff had been "haranguing" staff but "recognized [she] needed to stop, and would work to do so"; that Plaintiff was not entitled to greater legal assistance than other attorneys; and that Kennedy was considering firing Plaintiff. (Dkt. No. 62-1 at 108–109.) On May 17, 2021, Plaintiff sent Kennedy an email with the reasons she believed he should not fire her. (Dkt. No. 61-1 at 41–43.) Plaintiff stated that she had been unaware of "any sort of problem" with her performance prior to May 13th and emphasized that she had been working at JCPAO for six years and "maintained an active and successful motions practice" during that time. (*Id.* at 43.) Later that day, Plaintiff met with Kennedy and Rowlson. (*Id.* at 45.) Kennedy then terminated Plaintiff's employment as a deputy prosecutor for the JCPAO. (*Id.*) In September 2021, the JCPAO hired former Defendant Tuppence Macintyre, a woman who is about two years older than Plaintiff, to replace her. (Dkt. No. 61 at 4.)

There is limited evidence on the record documenting Plaintiff's time at JCPAO prior to March 2019. Plaintiff stated in her deposition testimony that "up until the final three weeks of my employment, I thought everything was just great" (Dkt. No. 62-1 at 10) and declared "I loved my job and enjoyed working with everyone in the office[.]" (Dkt. No. 69 at 22.) In his deposition, Kennedy affirmed that "we got along quite well until maybe February/March of

---

at him at a "shouting level that was heard by most of the office." (*Id.* at 10.) Plaintiff disputes that the conversation rose to the level of shouting or swearing from her side. (Dkt. No. 69 at 25.) In her declaration, she notes she may have spoken loudly and sworn generally, as was normal in the culture of the office, but that she did not swear "at" Kennedy. (*Id.*) Plaintiff instead declares Kennedy shouted and swore at her. (*Id.*)

2021 . . . [when] Ms. St. Marie [took over the district court docket and began] having a lot of problems with the digital nature of the court information, the file information, which was on a system called Laserfiche, and she was also having issues with her assigned paralegal." (Dkt. 68-1 at 176–177.)  However, Plaintiff also declared she complained about "constant sexual innuendo and crude, profane remarks" in the workplace prior to the spring of 2021.  (Dkt. No. 69 at 22.)

After leaving the JCPAO, Plaintiff started her own law practice.  (Dkt. No. 61 at 4.)  As a criminal defense lawyer, she frequently litigated opposite the JCPAO.  (*Id*.)  Plaintiff alleges that during this time, the JCPAO failed to communicate with her and blocked her website from some JCPAO computers.  (Dkt. No. 69 at 29.)  The record shows Defendants investigated the website issue and determined the site was temporarily unavailable due to an issue in the website's code, which caused it to be automatically flagged and blocked by the County's firewall.  (Dkt. No. 68-1 at 87.)  The record also confirms the JCPAO instituted a policy whereby its staff would only communicate with Plaintiff on the record or in writing after Plaintiff allegedly made misrepresentations to the court about JCPAO staff.  (Dkt. No. 68-1 at 221.)  Ultimately, several of Plaintiff's clients expressed concern that Plaintiff could not adequately represent them because the JCPAO appeared to treat her unfairly.  (Dkt. No. 63-1 at 3); (Dkt. No. 69 at 32).

In June 2022, Denver Shoop, an individual whom Plaintiff had prosecuted, filed a public records request seeking "[c]opies of records regarding the termination of employment of Deputy Prosecuting Attorney Julie St. Marie."  (Dkt. No. 61-1 at 47.)  After Plaintiff received third party notice of Shoop's request, she filed suit to enjoin the release of the records in Jefferson County Superior Court.  (*Id*. at 48.)  In the court filings, Plaintiff stated that JCPAO attorneys had made "unsubstantiated and libelous statements" about her.  (Dkt. No. 68-1 at 70.)  On June 24, 2022, a

local reporter published an article in the *Port Townsend Leader* about Plaintiff's Superior Court attempts to enjoin the County from releasing the records.  (*Id*.)  The article, reporting on the public pleadings in the case, stated that "[i]n the county's response . . . . [t]he county [] claimed St. Marie had constant trouble using the digital record system in Jefferson County District Court."  (*Id*. at 71.)  Shoop subsequently withdrew the public records request.  (Dkt. No. 60-1 at 2.)  Jefferson County and Plaintiff then stipulated to dismissal of the case, which was dismissed by Judge Lauren Erickson on October 20, 2022.  (*Id*. at 6.)

**B. Procedural History**

On November 16, 2022, Plaintiff filed a complaint asserting the following 14 claims:

- Claim 1 is against all Defendants and "brought pursuant to 42 U.S.C. § 1983, and the First, Fifth and Fourteenth Amendments of the United States Constitution, for violation of procedural and substantive due process rights[.]"  (Dkt. No. 1 at 28.)

- Claim 2 is against all Defendants and alleges that Jefferson County "failed to provide the Plaintiff with a procedurally constitutional *Loudermill* hearing[,]" thereby violating Plaintiff's Fifth and Fourteenth Amendment due process rights.  (*Id*. at 29.)

- Claim 3 alleges that all Defendants are liable under 42 U.S.C. § 1983 for "[r]etaliation [against Plaintiff] for the exercise of [Plaintiff's] First Amendment rights[.]"  (*Id*. at 33.)

- Claim 4 is against all Defendants except Macintyre for "supervisorial responsibility" "brought pursuant to 42 U.S.C. § 1983, for violation of Plaintiff's Constitutional rights under the First, Fifth, and Fourteenth Amendments[.]"  (*Id*. at 35.)

- Claim 5 is against Defendants Jefferson County, Kennedy, Ashcraft, Hunsucker, and Rowlson for "conspiracy to violate civil rights" "brought pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 1985 and 42 U.S.C. [§] 1986, and the First, Fifth, and Fourteenth Amendments[.]"  (*Id*. at 38.)

- Claim 6 is against Defendants Jefferson County, Kennedy, Ashcraft, Hunsucker, and Rowlson for sexual harassment in violation of the Washington Law Against Discrimination ("WLAD"), RCW Chapter 49.60.  (*Id*. at 40–42.)

- Claim 7 is against Defendants Jefferson County, Kennedy, Ashcraft, Hunsucker, and Rowlson and alleges a hostile work environment claim under the WLAD.  (*Id*. at 42–43.)

- Claim 8 is against Defendants Jefferson County, Kennedy, Ashcraft, Hunsucker, and Rowlson for sex discrimination under the WLAD.  (*Id*. at 44.)

- Claim 9 is against Defendants Jefferson County, Kennedy, Ashcraft, Hunsucker, and Rowlson for age discrimination under the WLAD.  (*Id*. at 45–46.)

- Claim 10 is against Defendants Jefferson County, Kennedy, Ashcraft, Hunsucker, Rowlson, and Macintyre for the tort of libel.  (*Id*. at 46.)

- Claim 11 is against all Defendants except for Ms. Macintyre for the torts of negligent hiring, supervision, and retention.  (*Id*. at 48.)

- Claim 12 is against Jefferson County, Kennedy, Ashcraft, Hunsucker, Rowlson, and Macintyre for the tort of outrage.  (*Id*. at 50.)

- Claim 13 is against all Defendants for tortious interference with a business expectancy.  (*Id*. at 52.)

- Claim 14 is against all Defendants for negligence "in addition to or in the alternative to the cause[s] of action above[.]"  (*Id*. at 53.)

On August 25, 2023, the Court dismissed claims One, Three, 10, 12, and 13 as to Macintyre.  (Dkt. No. 43.)  The Defendants now seek dismissal on summary judgment of all remaining claims asserted in Plaintiff's complaint.  (Dkt. No. 60.)

## III.    DISCUSSION

### A.  Legal Standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine if there is sufficient evidence on the record for a reasonable trier of fact to return a verdict for the nonmoving party.  *Id*.  The party moving for summary judgement bears the initial burden of identifying the portions

of the pleadings, discovery, and affidavits that show the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). If the issue is one in which the opposing party bears the burden of proof at trial, the moving party must only point out to the court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets this initial burden, the nonmoving party must point to specific facts in the record showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250; *T.W. Elec. Service Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ("[T]he nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgement."). If the nonmoving party fails to put forth such evidence, then the moving party is entitled to judgement as a matter of law. *Celotex*, 477 U.S. at 323. In determining whether a genuine dispute of material fact exists, "[t]he deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party." *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017).

## B. Claims against Spouses (All Claims)

Defendants argue that the Court should dismiss all Claims against Defendants' individual spouses. (Dkt. No. 60 at 17.) Defendants note that "Plaintiff repeatedly alleges that all individual defendants were acting within the course and scope of their employment," meaning that none of their alleged conduct involved their marital communities. (*Id.*) Plaintiff does not respond and offers no facts or legal authority in support of her federal or state law claims against the individual Defendants' spouses. (*See generally* Dkt. No. 68.)

Accordingly, Plaintiff's claims against all individual Defendant's spouses are DISMISSED on summary judgment.

## C. Derivative Claims (Cause of Actions One, Four, Five)

1   Defendants asserts Claims One, Four and Five are derivative of claims Two and Three.

2   (Dkt. No. 60 at 22.)  Plaintiff does not respond to Defendants' argument and otherwise makes no

3   effort to identify how claims One, Four, and Five are distinct from claims Two and Three,

4   factually or legally.  (*See generally* Dkt. No. 68.)  As is often cited, "judges are not like pigs,

5   hunting for truffles buried in briefs" or the record.  *United States v. Dunkel*, 927 F.2d 955, 956

6   (7th Cir. 1991).  Nor is it the Court's job to formulate arguments to distinguish one claim from

7   another.

8   Accordingly, Claims One, Four, and Five are DISMISSED on summary judgment.

9   **D.  Due Process Claim (Claim Two[2])—*Loudermill* Hearing**

10  The Fourteenth Amendment protects individuals from deprivation of property by the

11  government without due process.  *Portman v. Cnty. of Santa Clara,* 995 F.2d 898, 904 (9th Cir.

12  1993).  "A government employee has a constitutionally protected property interest in continued

13  employment when the employee has a legitimate claim of entitlement to the job."  *Id.* (citing *Bd.*

14  *of Regents v. Roth,* 408 U.S. 564, 577 (1972)).  To ascertain whether an employee has a

15  legitimate claim of entitlement, "a court looks to 'existing rules and understandings that stem

16  from an outside source such as state law.'" *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465,

17  475 (9th Cir. 1991) (quoting *Roth*, 408 U.S. at 577).  Under Washington law, "[c]onstitutionally

18  protected property interests may be created either through (1) contract, (2) common law, or (3)

19  statutes and regulations."  *Durland v. San Juan Cnty.*, 340 P.3d 191, 199 (Wash. 2014).

20

21

22  _____

[2] To the extent Plaintiff's asserts a Fifth Amendment violation in any of her claims, there is no

23  actionable claim because the "Fifth Amendment's Due Process and Equal Protection Clauses
    apply only to the federal government, not to state actors."  *Peoples v. Schwarzenegger*, 402 Fed.

24  Appx. 204, 205 (2010).

1    Plaintiff argues the County's Personnel Administration Manual adopted on January 4,

2 2021, created an entitlement to employment by "form[ing] part of the Plaintiff's employment

3 contract with Jefferson County."  (Dkt. No. 68 at 6.)  Defendants argue Plaintiff was not entitled

4 to employment as a deputy prosecuting attorney because under state law Plaintiff was always an

5 at will deputy prosecutor.  (Dkt. No. 60 at 18) (citing Wash. Rev. Code § 36.27.040).

6    In Washington, "[a]ny county, city, town or township may make and enforce within its

7 limits all such local police, sanitary and other regulations as are not in conflict with general

8 laws."  WASH. CONST. art. XI, § 11.  An ordinance, regulation, or resolution is "consistent with

9 article XI, section 11 unless it either prohibits what the state law permits, thwarts the legislative

10 purpose of the statutory scheme, or exercises power that the statutory scheme did not confer on

11 local governments."  *Emerald Enterprises, LLC v. Clark Cnty.*, 413 P.3d 92, 98 (Wash. 2018)

12 (internal quotations omitted).

13    Washington Revised Code § 36.27.040 is unambiguous: "The prosecuting attorney may

14 appoint one or more deputies who shall have the same power in all respects as their

15 principal . . . . The prosecuting attorney shall be responsible for the acts of his or her deputies

16 and may revoke appointments at will."  This means:

17     Deputy prosecutors are appointed for specified terms of office because their terms
      coincide with the elected prosecutor's term.  Unless a deputy's appointment is
18     revoked [by the prosecutor], the term of office for a deputy prosecutor ends when
      the term of the elected prosecutor ends.  Once hired, deputy prosecutors are not
19     entitled to remain deputy prosecutors should a new prosecutor become elected.

20 *Spokane Cnty. v. State*, 966 P.2d 305, 310 (Wash. 1998).[3]

21

22 [3] In *Spokane*, the State Supreme Court analyzed whether a deputy prosecutor was an employee
  under the State's Public Employees' Collective Bargaining Act."  (*Id*. at 307.)  In analyzing this
23 issue, the court concluded that a deputy prosecutor is not appointed for a specified term of office
  and that an elected prosecutor has authority to "clean house" and appoint new staff under
24

Because Washington law creates an at will relationship between an elected prosecutor and their appointed deputy prosecutors, finding Jefferson County's Personnel Administration Manual created an employment entitlement would thwart the legislative purpose of the statutory scheme governing elected prosecutors and their appointed deputy prosecutors.  Thus, Jefferson County's Personnel Administration Manual is preempted from conferring any employment entitlement to Plaintiff pursuant to article XI, section 11 of Washington's Constitution regardless of whether Jefferson County sought to create an employment contract through the Manual— which Defendants dispute—and regardless of Plaintiff's purported reliance on it.

Plaintiff, therefore, lacked a property interest in her employment and otherwise cannot maintain a Fourteenth Amendment due process claim based on her discharge as a deputy prosecutor.  Accordingly, Plaintiff's Fourteenth Amendment due process claim based on the alleged failure to provide a *Loudermill* hearing fails as a matter of law and is DISMISSED on summary judgment.

### E.  First Amendment Claim (Claim Three)

Plaintiff's complaint cites three incidents in which Defendants allegedly violated her First Amendment rights: (1) the JCPAO policy to communicate with her only in writing or in a court proceeding; (2) her alleged termination for speaking out against failing systems at the JCPAO and inappropriate conduct; and (3) the disabling of "public access to Plaintiff's webpage / site." (Dkt. No. 1 at 31–35.)  In disorderly fashion, Plaintiff peppers her opposition with short, conclusory statements lacking any citation to the record to support these allegations:

- Plaintiff was "subjected to wrongful termination . . . in retaliation for making repeated First Amendment complaints to defendant Kennedy

---

§ 36.27.040 once elected.  (*Id.* at 311.)  Based on the plain language of § 36.27.040 and the analysis in *Spokane*, a deputy prosecutor serves at the pleasure of an elected prosecutor and maintains no expectation of continued employment as a deputy prosecutor.

about the constant sexual innuendo in the office environment and her lack of administrative support, as detailed in her Declaration." (Dkt. No. 68 at 12.)

- "[D]efendants violated the Plaintiff's clearly established First Amendment rights by refusing to receive communication from her during trial, in her role as criminal defense attorney." (*Id.* at 18.)

- "The defendants retaliation against the Plaintiff for her speech is actionable. . . . Plaintiff spoke as a private citizen, about matters of public concern which did not affect her personally[.] . . . Genuine issues of material fact exist as to whether Plaintiff would have been fired but for her speech. (*Id.* at 19.)

It bears repeating that it is not the Court's task to search the record or identify arguments to support conclusory statements. *Dunkel*, 927 F.2d at 956.

### 1. Communication Policy

This Court previously concluded the JCPAO's communication policy did not impose a prior restraint on Plaintiff's speech and that Plaintiff failed to state a claim against Macintyre based on the communication policy. (Dkt. No. 43 at 4–7.) Plaintiff offers no argument, factual or legal, as to why the Court's prior analysis is not applicable to Plaintiff's claims against the remaining Defendants. Likewise, the Court is unaware of a reason why a different analysis should apply to Plaintiff's First Amendment claim, premised on the same communication policy, against the remaining Defendants.

Pursuant to the Court's prior ruling on this issue, Plaintiff's First Amendment claim against the Defendants premised on the JCPAO's communication policy is DISMISSED on summary judgment.

### 2. Termination as retaliation for complaints about "failing systems" and inappropriate office conduct

There are five sequential steps to analyzing a First Amendment retaliation claim brought by government employees:

1
2
3
4

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Hernandez v. City of Phoenix*, 43 F.4th 966, 976 (9th Cir. 2022) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)).  A government employee bears the burden of proving the first three steps.  *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 904 (9th Cir. 2021).  Once established, the burden shifts to the government to establish the last two steps.  *Id*. at 904–905.

"What constitutes speech on a 'matter of public concern' remains somewhat hazy, despite the decades that have passed since the concept was first employed."  *Hernandez*, 43 F.4th at 977. Instead, it is useful to identify speech that is not entitled to constitutional protection—"namely, speech on matters only of personal interest, such as speech addressing a personal employment dispute or complaints over internal office affairs." *Id*.  Indeed, "[m]ost speech falling outside that purely private realm will warrant at least some First Amendment protection and thus will qualify as speech on matter of public concern[.]"  *Id*. (internal quotations and citations omitted).  The "content of the statements, the form (time, place, and manner) of the statements, and the context in which the statements were made" are all considered in determining whether speech involved a matter of public concern.  *Id*.

As already noted, Plaintiff cites generally to her declaration (or provides no citation at all) as support for her position that she voiced "repeated First Amendment complaints" and "spoke as a private citizen, about matters of public concern which did not affect her personally." (Dkt. No. 68 at 12, 19.)

1    Regarding issues involving her assigned office staff, Plaintiff states in her declaration, "I

2    expressed concerns about how subpoenas were is issued" and references her May 6, 2021, email

3    to Kennedy.  (Dkt. No. 69 at 7.)  The email identifies complaints about the lack of staff support

4    and the effect on Plaintiff's ability to perform her duties.  (Dkt. No. 68-1 at 28–29.)  The

5    "speech" in the May 6, 2021, email can only be classified as involving a "purely personal

6    employment dispute or complaints over internal office affairs" as Plaintiff was upset with staff

7    assigned to her.  Plaintiff's complaints about office staff and the effect on Plaintiff's performance

8    is not speech on a matter of public concern.

9    Regarding Plaintiff's complaints "about the constant sexual innuendo in the office

10   environment" (Dkt. No. 68 at 12), Plaintiff does not identify the "content of the statements, the

11   form (time, place, and manner) of the statements, [or] the context in which the statements were

12   made." *Hernandez*, 43 F.4th at 977.  For example, Plaintiff declares she "expressed to Mr.

13   Kennedy numerous times my concerns that the excessively loud and excessively foul language,

14   particularly denigrating woman and victims, was inappropriate" (Dkt. No. 69 at 22) and that she

15   "repeatedly indicated [to Kennedy] that the constant sexual innuendo, crude language, rating of

16   victims as 'hot or not', and sexual gestures in my presence made me uncomfortable." (*Id*. at 23.)

17   Yet, Plaintiff provides no information specifying what Plaintiff specifically told Kennedy, when

18   it was told, where it was told, how it was told, or the context in which the statements were made,

19   who was present, what Kennedy's response was, etcetera.  Plaintiff's declaration offers no more

20   than a general description of complaints allegedly expressed to Kennedy.  Without more, the

21   Court lacks the ability to evaluate whether such complaints, assuming they occurred, concerned a

22   matter of public concern.

23

24

1      Plaintiff has not met her burden of establishing that she spoke on a matter of public

2 concern.[4]  Accordingly, Plaintiff's First Amendment retaliation claim based on allegedly

3 speaking out about inappropriate conduct is DISMISSED on summary judgment.

4      3.  Plaintiff's Website

5      Plaintiff's complaint states, a "First Amendment retaliation violation occurred when the

6 Defendants disabled public access to Plaintiff's webpage / site."  (Dkt. No. 1 at 34.)  Defendants

7 point out that, in general, an employer can disable access to internet sites on work computers.

8 (Dkt. No. 60 at 20) (citing *Urofsky v. Gilmore*, 216 F.3d 401, 409 (4th Cir. 2000)).  Defendant

9 also identifies the County's firewall was to blame for County employees being unable to access

10 Plaintiff's webpage.  (*Id*. at 20–21; *see also* Dkt. No. 61-1 at 53-55.)

11      Plaintiff makes no effort to respond to Defendant's arguments regarding access to

12 Plaintiff's website.  (*See generally* Dkt. No. 68.)  Moreover, Plaintiff offers no facts supporting

13 her allegation that the County disabled *public* access to her website as opposed to access via the

14 County's internal computer servers.  The Court is unaware of any authority, and Plaintiff offers

15 none, supporting a First Amendment retaliation claim based on an employer disabling internal

16 access to an external website.

17      Accordingly, Plaintiff's First Amendment retaliation claim based on disabled access to

18 Plaintiff's website is DISMISSED on summary judgment.

19   **F.  Sexual Harassment, Hostile Work Environment, and Sex Discrimination (Claims**

20       **Six, Seven, Eight)**

21

22 [4] Though it is unnecessary to analyze the remaining steps of a First Amendment retaliation claim,
Plaintiff also has failed to establish her alleged protected speech was a substantial or motivating
23 factor in her discharge.  Without any citation to the record, Plaintiff baldly asserts, "[g]enuine
issues of material fact exist as to whether Plaintiff would have been fired but for her speech."
24 (*Id*. at 19.)  Absent more, this is insufficient to meet her burden.

1      1.  <u>Sexual Harassment and Hostile Work Environment</u>

2          The WLAD provides that it is an "unfair employment practice" for any employer to

3   "discriminate against any person in compensation or in other terms or conditions of employment

4   because of . . . sex."  RCW 49.60.180(3).  The Washington Supreme Court has "interpreted this

5   section of the statute as prohibiting sexual harassment in employment."  *DeWater v. State*, 921

6   P.2d 1059, 1062 (Wash. 1996).  "Sexual harassment claims are generally categorized as 'quid

7   pro quo harassment' or 'hostile work environment claims.'"  *Id*. (citing *Payne v. Children's*

8   *Home Soc'y*, 892 P.2d 1102, 1105 n.2 (Wash. 1995)).  Quid pro quo harassment describes "a

9   situation where an employer requires sexual consideration from an employee as a quid pro quo

10  for job benefits." *Glasgow v. Georgia-Pacific Corp*. 693 P.2d 708, 711 (Wash. 1985).  In a

11  hostile work environment claim, "the employee seeks to hold the employer responsible for a

12  hostile work environment created by a supervisor or co-worker's sexual harassment of the

13  employee."  *Id*.  Although Plaintiff names sexual harassment and hostile work environment as

14  separate claims in her complaint, there are no facts on the record to support a quid pro quo type

15  claim.  Likewise, Plaintiff discusses the claims together as a hostile work environment claim in

16  opposing Defendant's motion for summary judgement.  (Dkt. No. 68 at 15.)

17          To establish a hostile work environment claim under the WLAD, an employee must show

18  that "(1) the harassment was unwelcome, (2) the harassment was because of sex, (3) the

19  harassment affected the terms or conditions of employment, and (4) the harassment is imputed to

20  the employer."  *DeWater*, 921 P.2d at 1063.  For harassment to affect the terms or conditions of

21  employment, it must give rise to an "abusive work environment" or be "sufficiently severe and

22  persistent to seriously affect the emotional or psychological well being of [the] employee."

23  *Glasgow*, 693 P.2d at 712.  Whether harassment is severe or pervasive is a question of fact.

24

*Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993).  The Washington Supreme Court has "frequently recognized" that federal caselaw interpreting Title VII law constitutes persuasive authority in construing the WLAD.  *Antonius v. King Cnty.*, 103 P.3d 729, 735 (Wash. 2004) (collecting cases).

Defendants contend that Plaintiff was never "the target" of any sexual comments and so was not actually "subject to" harassment herself.  (Dkt. No. 60 at 24–25.)  Plaintiff responds, citing generally to her declaration, that she had to "endure constant sexual inuendo and crude and profane remarks," and that she "repeatedly complained that the work atmosphere made her uncomfortable." (Dkt. No. 68 at 15.)  While Plaintiff does not dispute that she herself was not the target of any comments, she asserts that "office culture" can form the basis of a hostile work environment claim.  (*Id*. at 16.)

Contrary to Defendant's contention, a plaintiff who is not the direct subject of derogatory comments *can* make out a claim of hostile work environment if the workplace is utterly permeated with discriminatory, gender-based commentary.  *See Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 978 (9th Cir. 2023) ("individual targeting is not required to establish a Title VII violation"); *Coles v. Kam-Way Transp.,* 2017 WL 3980563, at *3 (Wash. Ct. Ap. 2017) ("A work environment may be considered hostile even if offensive comments are not made directly to the employee.").  However, "[o]bjectionable conduct is not 'automatically discrimination because of sex merely because the words used have sexual content or connotations'" that an employee finds upsetting.  *Sharp*, 69 F.4th at 978 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  "[A]n employee's overhearing of sporadic, offensive remarks directed at others in the same protected class is not enough" to make out a hostile work environment claim.  *Coles*, 2017 WL 3980563, at *4.

1   While the Court appreciates that this workplace appeared to tolerate some commentary

2   that a reasonable person might find insulting to women, Plaintiff has not put forth specific

3   evidence on the record to show that "severe and pervasive" sex-based commentary created a

4   hostile or abusive work environment. *Blackburn v. State*, 375 P.3d 1076, 1081 (Wash. 2015).

5   The facts Plaintiff provides are vague: she declares that there was frequent inuendo and crude

6   remarks "denigrating women and victims of crime" and that the "volume and content of

7   offensive conversations" between Ashcraft and Lysa Phillis made her "uncomfortable." (Dkt.

8   No. 69 at 22–23.)  Candace Drollinger's declaration affirms that "Ashcraft constantly flirted with

9   Ms. Phillis and the two of them regularly made gross sexual references."  (Dkt. No. 68-1 at 76.)

10  Beyond these generic descriptions, Drollinger declares she "can't speak to exactly which

11  comments [Plaintiff] heard in terms of sexual innuendo," although she states that Ashcraft

12  "would make loud comments, rating the 'sexiness' of victims of crime."  (Dkt. No. 68-1 at 77,

13  75.)

14  The inuendo-laden conversations between Ashcraft and Phillis would not lead a

15  reasonable person to infer that Defendants categorically "view[ed] women negatively, and in a

16  humiliating or degrading way."  *Reeves v. C.H. Robinson Worldwide, Inc*. 594 F.3d 798, 811

17  (11th Cir. 2010) (describing the kind of words and severity of conduct that might be found

18  "sufficiently gender-specific and either severe or pervasive [so that a plaintiff] may state a claim

19  of a hostile work environment, even if the words are not directed specifically at the plaintiff.");

20  *see also Glasgow*, 693 P.2d at 712.  And while Plaintiff indicates that comments about crime

21  victims made her upset, the facts do not create an objective finding that a reasonable person

22  would find them "so extreme [in severity or pervasiveness] as to amount to a change in the terms

23  and conditions of employment."  *Adams v. Able Bldg. Supply Inc*. 57 P.3d 280, 284 (Wash. Ct.

24

App. 2002).  Indeed, the only change Plaintiff indicates was her choice to begin wearing noise-cancelling headphones in the office.  (Dkt. No. 69 at 22.)  Thus, Plaintiff fails to put forth evidence on the record to show a genuine dispute of material fact as to her hostile work environment claim.

Accordingly, Plaintiff's sexual harassment and hostile work environment claims are DISMISSED on summary judgment.

2.   Sex Discrimination

"Discrimination claims under [the WLAD] may be brought under one of two theories, either 'disparate impact' or 'disparate treatment.'"  *Oliver v. Pac. Nw. Bell Tel. Co., Inc.*, 724 P.2d 1003, 1005 (1986).  Here, Plaintiff claims disparate treatment based on sex.  (Dkt. No. 68 at 12.)  Specifically, she asserts 1) wrongful demotion because of her sex in February 2019 and 2) wrongful termination because of her sex in May 2021.  (*Id.*)

a) Alleged Wrongful Demotion

Defendants argue that because "[t]he WLAD . . . has a three-year statute of limitations," any claim related to the events of February 2019 is untimely and must be dismissed.  (Dkt. No. 60 at 26.)  Plaintiff provides no response to the timeliness argument.  (*See generally* Dkt. No. 68.)

The Supreme Court of Washington has established that discrimination claims must be brought within the general, three-year statute of limitations.  *Antonius*, 103 P.3d at 732 (citing Wash. Rev. Code § 4.16.080(2)).  The court specified that "for discrete acts, the limitations period runs from the act itself, and if the limitations period has run, a discrete act is not actionable even if it relates to acts alleged in timely filed charges."  *Id.* at 733.  The court named "failure to promote" as a discrete act.  *Id.*  Plaintiff filed her complaint on November 16, 2022,

more than three years after the allegedly discriminatory demotion in February 2019.  On this basis, the Court finds that Plaintiff's sex discrimination claim as to her alleged demotion is untimely and fails as a matter of law.

b) Alleged Discriminatory Termination

Washington courts have adopted the three-part, *McDonnel Douglas* burden shifting framework for disparate treatment cases under the WLAD.  *Mikkelsen v. Pub. Utility Dist. No. 1 of Kittitas Cnty.*, 404 P.3d 464, 470 (Wash. 2017) (citing *McDonnell Douglas Corp. v. Percy Green*, 411 U.S. 792, 802 (1973)).  Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination by showing that "(1) she was within a statutorily protected class, (2) she was discharged by the defendant, (3) she was doing satisfactory work, and (4) after her discharge, the position remained open and the employer continued to seek applicants with qualifications similar to the plaintiff."  *Id*.  If the Plaintiff establishes the prima facie case, the burden then shifts to the defendant employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Id*. at 471 (citing *Scrivener v. Clark Coll*. 334 P.3d 541, 546 (Wash. 2014)).  If the employer successfully establishes a nondiscriminatory explanation, the burden then shifts back to the plaintiff to produce admissible evidence showing that the defendant's reason was pretextual or that, even if the stated reason was legitimate, discrimination was a substantial factor motivating the adverse employment action.  *Mikkelsen,* 404 P.3d at 471 (citing *Scrivener*, 334 P.3d at 546).  Contrary to Defendants' contention (Dkt. No. 60 at 25), the *McDonnell Douglas* "framework does not require a plaintiff to prove that she was replaced by a person outside her protected group to establish a prima facie case of discrimination."  *Mikkelsen,* 404 P.3d at 473.

1    Defendants cite to Plaintiff's alleged struggle in covering the district court docket,

2    interpersonal issues with her supervisors and other employees, and her causing a criminal case to

3    be dismissed as legitimate reasons for terminating her employment.  (*See* Dkt. No. 60 at 5–10.)

4    These reasons may be sufficient to prevent Plaintiff from making out prong (2) of the prima facie

5    case—that she was doing satisfactory work.  Assuming, however, that the prima facie case is

6    met, this rationale constitutes a legitimate, nondiscriminatory explanation for Plaintiff's

7    termination for the purposes of the burden-shifting framework.  "The employer's burden at this

8    stage is not one of persuasion, but rather a burden of production"; "[t]o go forward, the employer

9    need only articulate reasons sufficient to meet the prima facie case."  *Grimwood v. Univ. of*

10   *Puget Sound, Inc*. 753 P.2d 517, 521 (Wash. 1988).

11   Plaintiff argues that her termination was pretextual based on Kennedy's allegedly

12   "vague" deposition testimony about the reasons for her termination.  (Dkt. No. 68 at 13.)

13   However, Plaintiff does not put forth any evidence to show that "the employer's articulated

14   reason was a pretext for a discriminatory purpose" or that "[sex-based] discrimination was a

15   substantial factor" motivating the decision to terminate her.  *Scrivener*, 334 P.3d at 546.

16   Moreover, Kennedy's deposition testimony is in fact quite specific as to his reasons for

17   terminating Plaintiff.  (Dkt. No. 68-1 at 182–183, 198, 207) ("Her behavior towards [her

18   paralegal] was rude and disrespectful.  I would characterize it as abusive."); ("She did not get

19   subpoenas out[.]"); ("[We were] in this sort of acute timer period where everything's going

20   down, and she's not there half the time.  She's walking off the job.  She's absent.").  Because

21   Defendants put forth legitimate, nondiscriminatory reasons for terminating Plaintiff's

22   employment and Plaintiff does not put forth evidence that that they were pretextual or that sex

23

24

1   discrimination was a motivating factor in the discharge, Plaintiff's sex discrimination claim fails
2   as a matter of law.
3        Accordingly, Plaintiff's claims for sex discrimination are DISSMISSED on summary
4   judgement.
5   **G.   Age Discrimination Claim (Claim Nine)**
6        Plaintiff alleges that she was discriminated against based on age when Kennedy demoted
7   her and hired Ashcraft, "a younger[] male," in February 2019.  (Dkt. No. 68 at 17.)
8        For the same reasons cited in Section III.D.2. *supra*, this claim is untimely. The Court
9   accordingly DISMISSES Plaintiff's claim of age discrimination.
10  **H.   Libel Claim (Claim 10)**
11       In response to Defendant's interrogatories, Plaintiff identified 89 statements that she
12  asserted were libelous.  (Dkt. No. 62-1 at 114.)  However, Plaintiff did not identify the speaker
13  for any of the statements or indicate where the allegedly defamatory quotes might be found.
14  Defendants searched the responses to the public records requests made by Plaintiff or her counsel
15  to identify each statement and log it in a chart by speaker, audience, and document type.  (Dkt.
16  No. 63-1 at 17–40.)  Plaintiff takes issue with Defendant's characterization of three statements,
17  but beyond this does not dispute the information provided in Defendant's chart.  (Dkt. No. 68 at
18  23.)  The Federal Rules of Civil Procedure are clear that "[i]f a party fails to properly support an
19  assertion of fact or fails to properly address another party's assertion of fact" a court may
20  "consider the fact undisputed for the purposes of the motion."  Fed. R. Civ. P. 56(e)(2).
21  Accordingly, the Court finds the identification of the statements in Defendant's chart
22  unchallenged, except as to those three statements, which the Court itself has identified and
23  categorized.  In addition to the 89 statements, Plaintiff alleged in her Complaint that Defendants
24

1    published libelous statements about her when they produced documents in response to Shoop's

2    public records request.  (Dkt. No. 1 at 27.)  Defendants deny that any records were ever produced

3    in that case; assert that none of the 89 statements are libelous; and argue that the court should

4    "not only dismiss Plaintiff's tenth claim but impose $300,000 in damages and reasonable

5    attorney fees as sanctions."  (Dkt. No. 60 at 28.)

6        1.  <u>The 89 Statements</u>

7        An action for defamation requires a plaintiff to "prove four essential elements: falsity, an

8    unprivileged communication, fault, and damages" *Robel v. Roundup Corp.*, 59 P.3d 611, 621

9    (Wash. 2002) (citing *Mark v. Seattle Times*, 635 P.2d 1081, 1088 (Wash. 1981), *cert. denied*, 457

10   U.S. 1124 (1982)).  "When a defendant in a defamation action moves for summary judgment, the

11   plaintiff has the burden of establishing a prima facie case on all four elements."  *Marquez v.*

12   *Harborview Med. Ctr.*, 2018 WL 741321, at *7 (W.D. Wash. 2018).  "The prima facie case must

13   consist of specific, material facts, rather than conclusory statements, that would allow a jury to

14   find that each element of defamation exists."  *Id*.  A plaintiff satisfies the falsity prong by

15   providing "evidence that a statement is probably false or leaves a false impression due to omitted

16   facts."  *Yeakey v. Hearst Commc'ns, Inc.*, 234 P.3d 332, 335 (Wash. Ct. App. 2010) (citing *Mohr*

17   *v. Grant*, 108 P.3d 768, 773 (Wash. 2005)).  Additionally, "[b]efore the truth or falsity of an

18   allegedly defamatory statement can be assessed, a plaintiff must prove that the words constituted

19   a statement of fact, not an opinion."  *Robel*, 59 P.3d at 621.  Opinions are not actionable, as they

20   are protected under the First Amendment.  *Id*.  Truth serves as a complete defense to an action

21   for defamation.  *Mark*, 635 P.2d at 1086.

22       Plaintiff fails to make out a prima facie case of defamation as to any of the 89 statements.

23   She offers no specific evidence of falsity, instead citing cursorily to her own declaration.  (*See*

24

1   Dkt. No. 68 at 23.)  As the Supreme Court of Washington has emphasized, "conclusory

2   statements in a plaintiff's affidavit are insufficient; the plaintiff must demonstrate the basis for

3   his assertions" to survive a defendant's summary judgement motion in a defamation case.

4   *Herron v. Tribune Publ'g Co.*, 736 P.2d 249, 225 (Wash. 1987).  What is more, it appears that

5   most all the statements put forth as libelous are protected by either absolute or qualified

6   privilege.  Thus, Plaintiff fails to make out a prima facie case on at least two elements: falsity

7   and unprivileged communication.

8          Washington courts recognize the so-called common interest privilege, which applies

9   "when the declarant and the recipient have a common interest in the subject matter of the

10  communication."  *Momah v. Bharti*, 182 P.3d 455, 460 (Wash. Ct. App. 2008).  "This privilege

11  generally applies to organizations, partnerships and associations and 'arises when parties need to

12  speak freely and openly about subjects of common organizational or pecuniary interest.'"  *Id.*

13  (citing *Moe v. Wise*, 989 P.2d 1148, 1155 (Wash. Ct. App. 1999)).  Washington courts have also

14  held that "intracorporate communications" are not defamatory because they are not "published."

15  *Doe v. Gonzaga Univ.*, 24 P.3d 390, 387 (Wash. 2001), *rev'd on other grounds*, 536 U.S. 273

16  (2002). "For a corporation . . . acting through one of its agents or representatives, to send a

17  libelous communication to another of its agents or representatives cannot be a publication of the

18  libel on the part of the corporation."  *Prins v. Holland–North Am. Mortgage Co.*, 181 P. 680,

19  680–681 (1919).  Thus, communications between members of a corporation (such as emails

20  between co-workers) that take place in the ordinary course of business are not defamatory.

21  *Marquez*, 2018 WL 741321 at *7.

22          As Defendants point out, the approximately 50 statements sourced from private email

23  discussions between JCPAO co-workers are intracorporate communications.  (Dkt. No. 60 at 29.)

24

1    This includes the statements from Kennedy and Ashcraft's email correspondence (statements 1-

2    35; 43-48; 53-60; 69-75); the statement from an email between Kennedy and Hunsucker

3    (statement 87); and the statement sourced from Kennedy's tentative termination letter (statement

4    77). (Dkt. No. 63-1 at 17–40.) The statements from emails exchanged between Plaintiff and

5    Macintyre (statements 81-83) about the JCPAO's communication policy are not only covered by

6    the common interest privilege, but also were made to Plaintiff herself. (*Id*. at 63.) In Plaintiff's

7    reply to Defendant's motion for summary judgement, Plaintiff did not respond to any of

8    Defendant's arguments asserting these statements were privileged. (*See generally* Dkt. No. 68.)

9        Many of the allegedly libelous statements identified by Plaintiff originate in Defendants'

10    Answer (Dkt. No. 14) and its appendices. (*See* Dkt. No. 63-1 at 17–40) (identifying statements

11    36-42; 49-53; 61-68; and 79 as originating in litigation documents from this case). Similarly,

12    statements 84 and 85 are from Jefferson County's response to Plaintiff's motion in Jefferson

13    County Superior Court to enjoin the release of her termination files. (Dkt. No. 62-1 at 119–120.)

14    "Allegedly libelous statements, spoken or written by a party or counsel in the course of a judicial

15    proceeding, are absolutely privileged if they are pertinent or material to the redress or relief

16    sought, whether or not the statements are legally sufficient to obtain that relief." *Southcenter*

17    *Joint Venture v. Nat'l Democratic Pol'y Comm.*, 780 P.2d 1282, 1292 (1989) (quoting *McNeal v.*

18    *Allen*, 621 P.2d 1285, 1286 (1980)). These statements were made or used in litigation and are

19    therefore privileged. Statements 76, 88, and 89 are quotations from the Jefferson County

20    Superior Court filings that were published in the *Port Townsend Leader*. (Dkt. No. 68-1 at 70–

21    72.) Thus, statements 76, 88 and 89—made during a public judicial proceeding and reported by

22    the press—are likewise not subject to a libel claim. Finally, Plaintiff's allegation that statement

23    85—which Plaintiff herself made in an intracorporate email—was "published out of context" in

24

the *Port Townsend Leader* similarly fails, as the *Leader* was quoting the absolutely privileged Superior Court documents.

Lastly, statements 78 through 80 are from a police report filed by Defendant Kennedy regarding an alleged hit-and-run incident involving Plaintiff and a JCPAO staff member.  As an initial matter, statements 79 and 80 do not appear to have been made by any Defendant who was served with process, and thus the Court does not have personal jurisdiction to make findings. *See* Fed. R. Civ. P. 4.  As to statement 78—"I heard a very loud 'crunch,' and I knew immediately what had just occurred.  I didn't see the collision.  I knew Ms. St. Marie had just backed into a gray Subaru" (Dkt. No. 63-1 at 36)—Plaintiff fails to offer "specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." *Marquez*, 2018 WL 741321 at *7.  She provides no evidence of falsity beyond the account of the incident provided in her declaration, in which she claims to have "barely tapped DPA Phillips car."  (Dkt. No 69 at 30.)  She also puts forward no evidence of special or actual damages, which "must be alleged and proved" to avoid summary judgement when the allegedly defamatory words are not libelous per se.  *Haueter v. Cowles Pub. Co.*, 811 P.2d 231, 235 (Wash. Ct. App. 1991) (citing *Purvis v. Bremer's, Inc.*, 344 P.2d 705, 708 (1959)).  Thus, Plaintiff has failed to create a genuine issue of fact as to multiple, required elements of the defamation claim.[5]

    2.  <u>Complaint Allegations of Libel not in the 89 Statements</u>

---

[5] This section addresses every statement except for statement 86.  Statement 86 is from Rowlson's post-termination email relating to health insurance benefits.  (Dkt. No. 62-1 at 120.)  Rowlson indicates the final date of Plaintiff's healthcare coverage in the email.  (*Id.*)  The statement does not appear to be about Plaintiff, but rather about her healthcare coverage.  Thus, this statement is not libel as a matter of law.

1    Plaintiff alleges Defendants produced her termination file "in response to [a] public

2  record request [that] contained Kennedy and Ashcraft's emails denigrating the Plaintiff's

3  intellect, abilities, and personality." (Dkt No. 1 at 27.)  Defendants argue Plaintiff's claim "is

4  frivolous because Plaintiff knows nothing was disclosed to Shoop." (Dkt. No 60 at 28.)  Plaintiff

5  neither responds to this argument nor identifies any facts in the record indicating a genuine

6  dispute of fact.  The Superior Court's memorandum opinion affirms Defendants' assertion that

7  nothing was disclosed: "the requester chose not to intervene and withdrew his records request."

8  (Dkt. No. 60-1 at 3.)  Because nothing was disclosed, there can be no finding of libel as to this

9  claim.

10    3.  <u>Defendant's Request for Sanctions and Attorney's Fees</u>

11    Defendants move for sanctions under Federal Rule of Civil Procedure 11(b) and

12  attorney's fees and damages under Washington's Anti-SLAPP statute.  First, Defendants argue

13  that Plaintiff filing "a pleading that alleges a disclosure was made to Shoop when the Court in

14  Plaintiff's own Public Records Act Lawsuit found no such disclosure took place" violated the

15  requirement under Federal Rule of Civil Procedure 11(b)(3) that "a party that files a pleading

16  certifies that he has reasonably inquired into the truth of its factual allegations." (Dkt. No. 60 at

17  28.)  Second, Defendants argue that they are entitled to recovery of attorney's fees and a damage

18  award under the Anti-SLAPP statute, Washington Revised Code § 4.24.510.  (*Id*. at 30.)

19  Specifically, Defendants assert that because 30 out of the 89 allegedly defamatory statements

20  were sourced from Defendant's answer or Defendant Kennedy's police report, they are entitled

21  to $300,000 in statutory damages.  (*Id*.)  Plaintiff responds that the Anti-SLAPP statute "has no

22  application to Plaintiff's claims here and does not provide a basis to penalize the plaintiff for her

23  claims." (Dkt. No. 68 at 24.)

24

1    Federal Rule of Civil Procedure 11(c)(2) provides that "[a] motion for sanctions must be

2    made separately from any other motion and must describe the specific conduct that allegedly

3    violates Rule 11(b)." Fed. R. Crim. P. 11(c)(2).  Because Defendants request sanctions as part of

4    their motion for summary judgement rather than in a separate motion, the court must deny the

5    request for sanctions.

6    Washington's Anti-SLAPP statute "immunizes a 'person' who communicates a

7    complaint or information to a branch or agency of the federal, state, or local government from

8    civil liability." *Segaline v. State, Dep't of Labor and Industries*, 238 P.3d 1107, 1110 (Wash.

9    2010) (citing Wash. Rev. Code § 4.24.510.).  "The purpose of [the statute] is to protect citizens

10   who come forward with information that will help make law enforcement and government more

11   efficient and more effective." *K.M.P. by & through Pinho v. Big Brother Big Sisters of Puget

12   Sound*, 483 P.3d 119, 124 (Wash. Ct. App. 2021).  Although the statute may have been

13   applicable to the allegedly libelous statement in Defendant Kennedy's police report, Defendants

14   failed to raise the statute as an affirmative defense and thus waived it.  "Federal Rule of Civil

15   Procedure 8(a) and (c) provide that a defendant's failure to raise an 'affirmative defense' in his

16   answer effects a waiver of that defense." *In re Adbox, Inc*. 488 F.3d 836, 841 (9th Cir. 2007).  In

17   this case, Defendants should have become aware of the potential applicability of the statute after

18   receiving discovery responses in February 2023.  Yet they never moved to amend their

19   pleadings, thus waiving the defense. *See, e.g., Estate of Filion ex rel. Filion v. Johnson*, 2014

20   WL 1910470, at *2 (Wash. Ct. App. 2014) (finding that Defendant's failure to assert

21   Washington's Anti-SLAPP statute as an affirmative defense constituted waiver, preventing

22   Defendant from raising the defense at trial).  Accordingly, Defendant's request for attorney's

23   fees and damages under Washington Revised Code § 4.24.510 is DENIED.

24

1   All told, because Plaintiff failed to raise a genuine dispute of material fact as to her libel

2   claim, the Court DISMISSES the claim on summary judgement.  The Court DENIES

3   Defendant's request for sanctions under Federal Rule of Civil Procedure 11(b) and DENIES

4   attorney's fees and statutory damages pursuant to Washington Revised Code § 4.24.510.

5   **I.  Negligence and Negligent Hiring Claims (Claims 11 and 14)**

6   Defendants argue "Plaintiff's eleventh and fourteenth claims are . . . threadbare" and

7   "fail . . . because they fail the requirement of *Twombly* and *Iqbal*" (Dkt. No. 60 at 34), but focus

8   their attention on Plaintiff's negligence and negligent hiring assertions.  To prove negligence, a

9   Plaintiff must show: "(1) the existence of a duty owed to the complaining party; (2) a breach

10  thereof; (3) a resulting injury; and (4) a proximate cause between the claimed breach and

11  resulting injury."  *King v. Garfield Cnty. Pub. Hosp. Dist. No. 1*, 15 F. Supp. 3d 1111, 1115

12  (E.D. Wash. 2014) (citing *Pedroza v. Bryant*, 677 P.2d 166, 168 (Wash. 1984)).  To prove

13  negligent hiring, "a plaintiff must show that the employer had knowledge of the employee's

14  unfitness or failed to exercise reasonable care to discover unfitness before hiring or retaining the

15  employee."  *Anderson v. Soap Lake Sch. Dist.*, 423 P.3d 197, 206 (Wash. 2018).  To the extent

16  Plaintiff alleges her negligence claim stems from Macintyre's conduct, Plaintiff fails to put forth

17  facts indicating Macintyre breached any duty owed to Plaintiff.  (*See* Dkt. No. 68 at 24.)

18  Likewise, Plaintiff puts forward no facts on the record indicating that Macintyre was unfit or that

19  Defendants were aware of such unfitness.  (*Id.*)

20  As to the remainder of the claims contained in Claim 11, the Court agrees with

21  Defendants.  Plaintiff has failed to put forth facts towards the negligent supervision, negligent

22  retention, and failure to train actions also found in Claim 11.

23

24

1    Accordingly, the court DISMISSES Plaintiff's claims for negligence, negligent hiring,

2  negligent supervision, negligent retention, and failure to train.

3  **J. Outrage Claim (Claim 12)**

4    Under Washington law, "[t]he tort of outrage requires the proof of three elements: (1)

5  extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and

6  (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 66 P.3d 630, 632

7  (Wash. 2003). "The first element requires proof that the conduct was 'so outrageous in

8  character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

9  regarded as atrocious, and utterly intolerable in a civilized community.'" *Robel*, 59 P.3d at 619

10  (quoting *Dicomes v. State*, 782 P.2d 1002 (Wash. 1989)). Accordingly, "the tort of outrage 'does

11  not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other

12  trivialities'" because the law expects plaintiffs to "be hardened to a certain degree of rough

13  language, unkindness and lack of consideration." *Kloepfel*, 66 P.3d at 632 (quoting *Grimsby v.*

14  *Samson*, 530 P.2d 291, 295 (Wash. 1975)). The conduct must be such that "the recitation of the

15  facts to an average member of the community would arouse his resentment against the actor and

16  lead him to exclaim 'Outrageous!'" *Kloepfel*, 66 P.3d at 632 (quoting *Reid v. Pierce Cnty.*, 961

17  P.2d 333, 337 (Wash. 1998)).

18    Plaintiff's outrage claim stems from two instances: "Macintyre's refusal to engage

19  professionally" and the events surrounding her termination. (Dkt. No. 1 at 51.) The court

20  previously dismissed the complaint as to Macintyre, finding that her communications were not

21  outrageous. (Dkt. No. 43 at 9.) Regarding the claim of outrage based on Plaintiff's termination,

22  Washington courts hold that common law tort claims—such as outrage and emotional distress—

23  cannot be based on the same facts underlaying a plaintiff's claim for unlawful discrimination

24

under the WLAD.  *See Arthur v. Whitman Cnty*. 24 F.Supp 3d 1024, 1034 (E.D. Wash. 2014)

("Because the factual basis for Plaintiff's outrage and NIED claims is the same as her WLAD

hostile work environment and retaliation claims, her avenue for recovery is limited to her WLAD

claims."); *Id*. at 1039 ("Plaintiffs' common law claims for outrage and NIED are DISMISSED as

being duplicative of her WLAD hostile work environment and retaliation claims"); *Anaya v.*

*Graham*, 950 P.2d 16, 20 (Wash. Ct. App. 998) ("[T]he outrage claim duplicates the

discrimination claim. We affirm the dismissal on that basis[.]"); *Francom v. Costco Wholesale*

*Corp*., 991 P.2d 1182, 1192 (Wash. Ct. App. 2000).  Here, Plaintiff's outrage arises directly from

the events that underlie her claims under the WLAD.  Accordingly, it is duplicative and must

properly be dismissed.  Moreover, nothing in the facts, even viewed in the light most favorable

to Plaintiff, indicates that her manner of discharge was "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community." *Robel* 59 P.3d at 619 (quoting

*Dicomes v. State*, 782 P.2d 1002, 1012 (1989)).

Accordingly, the Court DISMISSES Plaintiff's outrage claim on summary judgement.

## K.  Tortious Interference with Business Expectancy Claim (Claim 13)

A Plaintiff claiming tortious interference with a business expectancy must prove: "(1) the

existence of a valid contractual relationship or business expectancy; (2) that defendants had

knowledge of that relationship; (3) an intentional interference inducing or causing a breach or

termination of the relationship or expectancy; (4) that defendants interfered for an improper

purpose or used improper means; and (5) resultant damage." *Pac. Nw. Shooting Park Ass'n*, 144

P.3d 276, 280 (Wash. 2006) (quoting *Leingang v. Pierce Cnty. Med. Bureau, Inc*., 930 P.2d 288,

300 (Wash. 1997)).  Regarding the third element, "[i]nterference with a business expectancy is

intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 52 P.3d 30, 34 (Wash. Ct. App. 2002). As to the fourth element, "[i]nterference is for an improper purpose if it is wrongful by some measure beyond the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession." *Id*.

Plaintiff fails to make out a prima facie case as to numerous elements of her claim. Beyond stating generally that "Defendants knew of Plaintiff's business expectancy in a general sense and with respect to clients who had already retained her," Plaintiff fails to point to facts in the record showing Defendants were aware of her client relationships. (Dkt. No. 68 at 21.) To demonstrate the third prong, Plaintiff cites to an email from a client that states: "[b]ecause we used Julie St. Marie as our lawyer, it seemed the entire county was against us." (Dkt. No. 68-1 at 114.) Although this suggests that she did lose clients, it does not establish that Defendants "desire[d]" to bring about that outcome or knew it was "substantially certain." *Newton,* 52 P.3d at 34. Likewise, Plaintiff does not put forward evidence that shows Defendants harbored "an improper objective of harming the plaintiff" or pursued the "use of wrongful means that in fact cause[d] injury to plaintiff's contractual or business relationship." *Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989). Plaintiff's general response that the "totality of circumstances here demonstrates the defendant's improper purpose," is supported only by her own declaration and account of the events. (Dkt. No. 68 at 21.) Thus, it fails to raise a genuine dispute of material fact.

Accordingly, the Court DISMISSES Plaintiff's claim for negligent interference with a business expectancy on summary judgement.

1

## IV.    CONCLUSION

2          For the reasons stated above, the Court GRANTS Defendants' motion for summary

3  judgment in its entirety.  All of Plaintiff's remaining claims are DISMISSED as a matter of law.

4  The Court DENIES Defendants' request for sanctions and attorney's fees.

5          Dated this 29th day of August 2024.

6

7

8                                              David G. Estudillo
                                              United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24